HAO THI POPP *v.* RICHARD LUCAS ET AL.

COTTER, C. J., BOGDANSKI, PETERS, HEALEY and PARSKEY, Js.

Argued October 15—decision released December 23, 1980

*Lucy V. Katz,* with whom were *Richard A. Bieder,* and, on the brief, *Theodore I. Koskoff,* for the appellant-appellee (plaintiff).

*Douglas R. Daniels* and *Paul Sherbacow,* for the appellees-appellants (defendants).

*Martin Guggenheim* and *Nancy Stearns* filed a brief as amici curiae.

BOGDANSKI, J. This controversy arose out of a unique factual context, one which occurs perhaps once in a generation: The separation in wartime of children from their parents. It has given rise to six appeals, all of which stem from the same chain of events starting in Vietnam in the 1970s.

The plaintiff is the mother of two minor children, Mark and Paul, who are the subject of this action. The plaintiff is also the mother of a third son, Larry, born in 1972.[1] All three boys are of mixed Vietnamese and Caucasian blood. On September 16, 1976, the plaintiff filed a petition for a writ of habeas corpus seeking the return of Mark and Paul, whom she had relinquished in Vietnam to Friends For All Children (hereinafter FFAC) on April 14, 1975. She claimed that (1) the relinquishment was revocable under Vietnamese law; (2) the relinquishment document was signed under duress; and (3) it would be in the best interest of the children to be with their natural mother. On April 22, 1977, the trial court found all three issues for the defendants.[2]

---

[1] The youngest child had been placed for adoption in Colorado by another international adoption agency, Friends of Children of Vietnam. A Colorado court eventually returned this child to the plaintiff's custody. *In re Le Thanh Tung,* Colorado District Court, Adams County, Docket No. J6-5679-N (June 16, 1977) (reporter's partial transcript).

[2] Other American courts which have considered similar cases have returned the Vietnamese children to their natural parents. *Tinh* v. *Drury,* California Superior Court, Docket No. HCN 0032 (February 8, 1977); *Le Thi Sang* v. *Knight,* California Superior Court, San Jaoquin County, Docket No. 125898 (April 26, and September 22, 1977); *In re San Nang Hien,* California Superior Court, Los Angeles County, Docket No. A-9896 (January 14, 1976); *Duong Bich Van* v. *Dempsey,* Michigan Circuit Court, 6th Circuit, Oakland County, Docket No. 76-140499AH (June 21, 1976); *Baker* v. *Scott,* Ohio Court of Appeals, Docket No. 38455 (May 29, 1979); *Duong Thi Yen Nga* v. *Coner,* Pennsylvania Court of Common Pleas, Miscellaneous Term, Chester County, Docket No. 153 (July 30, 1976).

The plaintiff and her children lived in Vietnam until 1975. At the trial, the plaintiff testified that, towards the end of the Vietnam war, she became frightened that if the North Vietnamese took over Saigon, she and her children would be killed. Throughout the war, rumors prevailed that the North Vietnamese would kill civilians and that mixed blood children would be in particular danger. During late 1974 and early 1975, the North Vietnamese army captured large parts of South Vietnam. Newspapers and television media carried stories of refugees fleeing the captured areas. One witness told of television news of dead people in the streets, and children trying to crawl on their mothers' corpses. The plaintiff herself recalled the news of massive civilian deaths when the North Vietnamese had temporarily captured the city of Hue in 1972.

As the northern army came closer to Saigon, the plaintiff became more fearful for her children. There was a general atmosphere of panic and fear in the city. In early April, 1975, in response to the emerging military situation, the United States Agency for International Development and the South Vietnamese Ministry of Social Services jointly arranged Operation Babylift, the evacuation of over 2000 children from orphanages in Vietnam. The Vietnamese government issued collective permits for children evacuated in a group, and waived much of the individual documentation normally required for foreign adoptions. Most, but not all, of the children were orphans in various stages of adoption. Vietnamese parents in some cases gave up their children for adoption in the United States through the babylift when they themselves could not arrange a way out of the country.

In the fall of 1974, the plaintiff began making plans to get her children out of Vietnam and to the United States. She did not, however, part with the children until April, 1975. The plaintiff asked the defendant Lucas, an American working in Saigon, to take her children to the United States. He agreed to do so providing he could adopt them and arranged for the plaintiff to sign a relinquishment document to Friends For All Children, Inc., an American international adoption agency operating in Saigon with which Lucas had had a prior relationship. Lucas had been a volunteer foster parent to some of FFAC's children and had discussed adoption with the agency before. On April 15, 1975, the plaintiff signed an FFAC document entrusting the two children to the agency. The English translation of the relinquishment document stated, "I the undersigned . . . having sole custody of this child, do hereby irrevocably relinquish all my parental rights and custody of the said child to Friends For All Children, Saigon. I release this child for the purpose of adoption by suitable adoptive parents who can assure his/her future. I understand that once the adoption has been consummated legally, the adoptive parents will assure all the legal rights and responsibilities for the child. I hereby waive any rights which I now have as mother to the child."

The two older boys were taken out of Vietnam by FFAC on April 24, 1975, and sent to live with Lucas' brother and sister-in-law in Massachusetts while Lucas remained in Thailand. When she signed the FFAC document, the plaintiff had no way of getting to the United States herself. Sometime later, however, she was able to arrange for her own transportation to the United States leaving

her youngest child in Vietnam with an American minister. When the plaintiff arrived in this country, she immediately began a long legal battle for the return of her children.

In its 1977 decision, the trial court found that the plaintiff voluntarily relinquished her parental rights in the two children, that the relinquishment agreement was not revocable under Vietnamese law and that, even if it was revocable, the court would not accord comity to such an unlimited right of revocation. The court further concluded that the legal issue was reduced to a case in which a natural mother, who had relinquished her parental rights, wished to abrogate her agreement. The court then applied the "best interests of the child" test set forth in General Statutes § 46b-56 (formerly § 46-42) and ruled that the children should remain with Lucas.

On her appeal, the plaintiff asserts that the trial court, in effect, terminated her parental rights which it had no authority to do.

We agree. In this habeas proceeding, the trial court had no jurisdiction to terminate parental rights. This is so even though it was the plaintiff who requested the court to rule on the validity of the relinquishment agreement. It is well settled that a claim that a court lacks subject matter jurisdiction cannot be waived by the parties. *LaBow* v. *LaBow,* 171 Conn. 433, 440, 370 A.2d 990 (1976).

Termination of parental rights means "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child

is free for adoption . . . ." General Statutes § 45-61b (g). It is a most serious and sensitive judicial action. *In re Juvenile Appeal (Anonymous)* 181 Conn. 638, 640, 436 A.2d 290 (1980). " 'Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection.' " Ibid, quoting *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 671, 420 A.2d 875 (1979).

Parental rights may be terminated by decree of the probate court pursuant to General Statutes § 45-61c (b) or by decree of the juvenile division of the Superior Court in a proceeding brought by the commissioner of children and youth services under § 17-43a. Neither procedure was followed in the present case. Although the defendants argue that the trial court did not seek to terminate the plaintiff's parental rights, that clearly was the effect of its ruling when it found that the relinquishment was irrevocable.

The relinquishment document signed by the plaintiff did not terminate the plaintiff's parental rights under Connecticut law. Even if the relinquishment were irrevocable under Vietnamese law, we would not accord comity to it. "[C]omity is a flexible doctrine, the application of which rests in the discretion of the state where enforcement of a foreign order is sought. Because comity is a flexible doctrine, its contents are peculiarly subject to the dictates of public policy and considerations of fairness to litigants." *Walzer* v. *Walzer,* 173 Conn. 62, 70, 376 A.2d 414 (1977). It is the public policy of this state

that a court of competent jurisdiction approve a termination petition. See General Statutes § 45-61a through § 45-61f. Under our law termination of parental rights cannot be effected through private contractual arrangements.

In her complaint, the plaintiff had petitioned the court for the custody of her children to vindicate her parental rights. Exercising its habeas powers, the court could decide the issue of custody, based upon the best interests of the children, so long as it did so with due regard for the plaintiff's parental rights. In any controversy between a parent and a stranger,[3] the parent " 'should have a strong initial advantage, to be lost only where it is shown that the child's welfare plainly requires custody to be placed in the stranger.' " *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 662, 420 A.2d 875 (1979). "The right to the integrity of the family is among the most fundamental rights guaranteed by the fourteenth amendment." *State* v. *Anonymous,* 179 Conn. 155, 162–63, 425 A.2d 939 (1979). Thus, the plaintiff has a constitutional right to preserve her parental rights in the absence of a powerful countervailing state interest. *Stanley* v. *Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). This amounts to a presumption which the defendant must overcome. To the extent that the language in such cases as *Howarth* v. *Northcott,* 152 Conn. 460, 464, 208 A.2d 540 (1965), and *Antedomenico* v. *Antedomenico,* 142 Conn. 558, 562, 115 A.2d 659 (1955), which involved custody contests between biological parents, suggests a rule

---

[3] As used by Clark, the term "stranger" means anyone not a parent. It may include relatives, friends or child care agencies. Clark, Domestic Relations § 17.5, p. 591 n.1.

different from that which we articulate today for disputes involving a third party, those cases are hereby overruled.

On remand, the trial court may not consider the relinquishment a controlling factor in determining custody. The relinquishment does not abrogate the presumption in favor of parental custody. As the natural parent, the plaintiff is entitled to custody unless it is established that the children's welfare plainly requires otherwise.

The trial court also ordered visitation between the plaintiff and the children to take place on October 2 and 3, 1978. On October 2, the defendants filed an appeal and failed to produce the children on the assumption that the appeal automatically stayed the visitation order. On October 4, 1978, the plaintiff moved that the defendant be held in contempt for failure to comply with the visitation order. The court, however, declined to act on the contempt motion until this court had acted on the appeals.

The plaintiff now assigns error in the court's refusal to grant her contempt motion. Since the trial court did not decide the issue on the merits, we cannot review its decision. This court hears no evidence and cannot find facts. *Pelc* v. *Danbury,* 166 Conn. 364, 366, 349 A.2d 825 (1974).

The plaintiff has also raised other claims of error in the denial of her writ of habeas corpus. Because our determination requires reversal, they need not be considered.

As already noted, five other appeals are involved in this controversy.

The defendant has appealed from decisions of the trial court ordering visitation by the plaintiff to take place on October 2, 3 and 10, 1978. Since those dates are long past, these appeals are now moot. " '[I]t is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow.' " *Jones* v. *Ricker,* 172 Conn. 572, 576, 375 A.2d 1034 (1977).

The defendant has also appealed from an order of the trial court granting the plaintiff visitation from January 22, 1979, until January 26, 1979, between the hours of 1 p.m. and 4:30 p.m. daily and each year thereafter five days during the month of January, the specific days to be ordered by the court, and daily on the Monday following Easter Sunday, to the Friday of each year between the same hours and under the same conditions. On January 4, 1980, the court ordered dates for visitation to be January 21–25, 1980. On January 18, 1980, the defendant took an appeal from this order also.

General Statutes § 46b-56 provides that the Superior Court may make any proper order regarding the visitation of children, guided by the best interests of the children. The court's decision must stand unless it abused its discretion. *Spicer* v. *Spicer,* 173 Conn. 161, 162, 377 A.2d 259 (1977). We find no such abuse of discretion present here.

On July 5, 1978, the plaintiff again moved for custody. This was denied by the court on November 8, 1978. The plaintiff appealed on December 26, 1978. The present decision renders this issue moot.

With respect to the appeal of the habeas corpus action, there is error, the judgment is set aside and the case is remanded for further proceedings not inconsistent with this opinion.

In this opinion the other judges concurred.